UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| DIRECTV, LLC | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 5:13-cv-00111 |
| | ) | |
| ROBERT SAYLOR, et al., | ) | |
|     Defendants. | ) | By:   Joel C. Hoppe |
| | ) |        United States Magistrate Judge |

<u>REPORT & RECOMMENDATION</u>

This matter is before me for a report and recommendation on *pro se* Defendant Robert Saylor's Motion to Dismiss the Amended Complaint for Improper Venue or to Grant Arbitration, ECF No. 36, and Defendants Bruce Taylor and Ellicott City Cable's Motion to Dismiss the Amended Complaint for Lack of Personal Jurisdiction, ECF No. 42. The parties have fully briefed the matters, making them ripe for determination, and the Court held oral argument on September 19, 2014. Having considered the parties' pleadings, supporting exhibits, briefs, oral arguments, and the applicable law, I respectfully recommend that the presiding District Judge **DENY with prejudice** Saylor's motion to dismiss for improper venue, **DENY without prejudice** Saylor's motion to compel arbitration, and **DENY without prejudice** Taylor and Ellicott City Cable's motion.[1] Additionally, I recommend that the Court stay this action to allow Saylor and DIRECTV, LLC to arbitrate the disputes between them.

I. Background

On December 6, 2013, Plaintiff DIRECTV, LLC ("DIRECTV"), a California limited liability company, filed suit in this Court against Robert Saylor ("Saylor"); Sky Cable, LLC

_____

[1] The defendants' respective motions to dismiss DIRECTV's original complaint are also pending. ECF Nos. 26, 29. I recommend that the presiding District Judge deny these motions as moot.

("Sky Cable"), a Virginia limited liability company; Bruce Taylor ("Taylor"); Ellicott City Cable, LLC ("ECC"), a Maryland limited liability company; and John Does 1–5. Compl. ¶¶ 1, 4–9, ECF No. 1. The case involves allegations of stolen DIRECTV programming and the unauthorized use of DIRECTV's intellectual property after DIRECTV and Sky Cable ended their long-running business relationship in the spring of 2011. *See* Amend. Compl. ¶¶ 1, 6, ECF No. 32.

A.     *The Amended Complaint*

Because this case is before the Court on motions to dismiss, the facts alleged in the Amended Complaint must be taken as true and all reasonable inferences must be drawn in the plaintiff's favor. *Warren v. Sessoms & Rogers, P.A.*, 676 F.3d 365, 373 (4th Cir. 2012). DIRECTV sells digital programming to residential and commercial customers throughout the United States. *See id.* ¶ 13. Most programming distributed by DIRECTV is first delivered to its broadcast centers in California and Colorado, where the signals are digitized, compressed, and encrypted before being transmitted to stationary orbiting satellites. *Id.* ¶ 15. The satellites then beam those encrypted signals back to "more than 20 million homes and businesses equipped with specialized DIRECTV receiving equipment." *Id.* ¶¶ 13, 16.

DIRECTV provides programming to multiple-dwelling unit ("MDU") residential and commercial properties using a Satellite Master Antenna Television ("SMATV") system. *Id.* ¶¶ 27, 32. "In an MDU system, DIRECTV's satellite signal is received through one or more satellite dishes mounted onsite and distributed to individual units within the building or adjacent buildings." *Id.* The infrastructure used to distribute these signals is sometimes called a "private cable system" because this system is not legally permitted to cross public rights-of-way. *Id.* ¶ 39.

The company ties its monthly SMATV fees to the type of programming that the MDU property owner (i.e., "the customer") orders and the number of "subscriber units" that have

access to the programming. *See id.* ¶¶ 27–28. MDU properties may qualify for "[b]ulk television programming packages" that cost substantially less than comparable single-dwelling unit residential packages. *Id.* ¶ 20. Under the terms of the SMATV and MDU agreements, customers must identify the physical address of the property receiving DIRECTV programming, declare the number of subscriber units that will have access to the programming, and certify that the property is an MDU property eligible to receive DIRECTV programming. *See id.* ¶¶ 24, 29, 36. DIRECTV customers cannot receive, view, resell, retransmit, or rebroadcast programming at or to unapproved properties. *See id.* ¶¶ 25, 30, 37. Nor may SMATV and MDU customers charge their residents for "base package" DIRECTV programming "separate and apart from the rent charged" for the MDU property. *See id.* ¶¶ 21, 30, 32. DIRECTV separately bills residents who upgrade the basic DIRECTV programming and service options that are provided by the MDU property owner as an amenity. *See id.* ¶ 22.

DIRECTV also contracts with local dealers, called System Operators, to install and maintain "satellite television infrastructure at MDUs and to solicit residential MDU customers for DIRECTV." *Id.* ¶ 19. Defendant Sky Cable was an authorized DIRECTV dealer between 1998 and 2011, and defendant Saylor was Sky Cable's president during that time. *Id.* ¶¶ 5, 6, 40.

Sometime around spring 2006, Saylor and Sky Cable began helping property owners in Kansas, Maryland, and states unknown set up infrastructure and fraudulent DIRECTV accounts in order to resell programming to their residents. *See generally id.* ¶¶ 40, 43–53, 54–68, 69–83. Saylor and Sky Cable "concocted a scheme whereby companies would be able to obtain special programming packages from DIRECTV at discounted rates by misrepresenting both the type of properties that the programming would be distributed to and the number of viewers that would be accessing the programming." *Id.* ¶ 41. Taylor and ECC "acted in concert" with Saylor and Sky

Cable in furtherance of the scheme to defraud DIRECTV and to unjustly enrich themselves. *See id.* ¶¶ 56, 58–60, 62–66, 68, 70, 72–79, 81.

       1.    *The Taylor Village & Waverly Gardens Accounts*

Taylor and ECC hired Saylor and Sky Cable "to set up a system to deliver satellite television programming" to two of Taylor's residential developments in Maryland. *Id.* ¶ 55; *see also id.* ¶¶ 54–57, 59, 69–70, 73. In March 2006, the defendants submitted documents to DIRECTV in order to set up a Commercial SMATV account for "Taylor Village" in Ellicott City. *Id.* ¶ 56. Taylor Village's SMATV Agreement certified that "only 100 subscriber units" at 4100 College Avenue, Ellicott City, Maryland, would have access to DIRECTV programming. *Id.* ¶¶ 56, 58.

According to DIRECTV, the documents actually listed two physical addresses[2] for Taylor Village in Ellicott City, neither of which "is a 100 unit SMATV eligible property." *Id.* ¶ 57. Saylor, Sky Cable, Taylor, and ECC intended at the time to set up an unauthorized private cable system and ultimately supplied programming to "well in excess of 100 units" in "numerous additional buildings" throughout the Taylor Village development. *Id.* ¶ 58. Taylor Village's SMATV Viewing Agreement was signed by Taylor on behalf of ECC and listed "Robert Saylor as the authorized installer." *Id.* ¶ 56. Documents submitted later list Saylor or his purported employee as the "authorized officer/agent for Taylor Village." *Id.* ¶ 57 (internal quotation marks omitted). At least some of the "account documentation concerning the Taylor Village SMATV account was submitted to DIRECTV by fax by defendant Sky Cable from its location in Elkton, Virginia." *Id.*

---

[2] Some documents listed the property's physical address as 4100 College Avenue, while others listed the physical address as 8001 Hillsborough Road. *See* Amend. Compl. ¶ 57.

Saylor and Sky Cable also helped Taylor and ECC set up at least one fraudulent MDU account for Taylor Village around April 2006. *Id.* ¶ 59. The MDU bulk application(s) contained "inaccurate addresses and misleading information" that led DIRECTV to believe its "MDU programming was being supplied to MDU-approved properties." *Id.* Taylor and ECC also granted "Sky Cable . . . the ROE [right of entry] to service the MDU [system] at Taylor Village" in a written agreement dated March 31, 2006. *Id.* The defendants used this system to provide "programming through a private cable system for a variety of buildings and residences within Taylor Village, which [they] resold to the occupants and residents." *Id.* ¶ 60.

Taylor and ECC "made regular monthly payments to DIRECTV" on the Taylor Village accounts between April 2006 and July 2012. *Id.* ¶ 66. "At the times and on the dates they made each payment, [Taylor and ECC] failed to inform DIRECTV that its programming was being used to supply television content to additional viewers at [unauthorized] locations." *Id.* Saylor and Sky Cable "assisted and counseled [Taylor and ECC] with regard to multiple false representations and omissions in furtherance of . . . [their] scheme to defraud DIRECTV through redistribution and resale of the DIRECTV programming obtained through the SMATV and MDU accounts." *Id.* ¶ 62; *accord id.* ¶ 65 (alleging that the named defendants "intentionally and fraudulently misrepresented to DIRECTV the location where DIRECTV receiving equipment would be installed and maintained[] and how the programming would be distributed"). The Taylor Village "accounts were actively managed by the Defendants by Sky Cable from its offices in Elkton, Virginia." *Id.*

Saylor and Sky Cable also helped Taylor and ECC set up fraudulent MDU and SMATV accounts for a property called "Waverly Gardens"[3] in Woodstock, Maryland. *Id.* ¶¶ 69, 70, 73. ECC, with Saylor and Sky Cable's guidance and assistance, submitted an MDU application that caused DIRECTV to believe its bulk programming would be supplied to 108 subscriber units at an MDU-eligible property at 10801 Enfield Drive, Woodstock, Maryland. *Id.* ¶¶ 72, 73. The defendants instead "used the MDU systems to provide programming through a private cable system for a variety of buildings and residences in the general vicinity of the Waverly Gardens apartment building, which [they] resold to the occupants and residents." *Id.* ¶ 74; *accord id.* ¶¶ 75–76.

In June 2006, Saylor, Sky Cable, Taylor, and ECC, acting in concert, submitted documents to DIRECTV in order to set up a Commercial SMATV account for Waverly Gardens. *Id.* ¶ 70. The documents again certified that "only 108 subscriber units" at Waverly Gardens would have access to DIRECTV programming. *Id.* ECC's New Customer Information Form listed the property's physical address at 10801 Enfield Drive in Woodstock, Maryland. *Id.* However, "the contact name for [this] property is listed as Robert Saylor, and the billing address submitted by the Defendants for the property was 315 W. Spotswood Trail, Elkton, Virginia." *Id.* ¶ 71. "At the time they were established, the[] accounts for Waverly Gardens were actively managed by the Sky Cable Defendants from its offices in Elkton, Virginia." *Id.* ¶ 77.

Taylor and ECC also made regular monthly payments to DIRECTV for services provided under Waverly Gardens' SMATV and MDU accounts. *See id.* at ¶ 81. According to DIRECTV, neither Taylor nor ECC informed the company that its programming was being supplied or

---

[3] The Defendants refer to this property as "Waverly Woods." *See, e.g.*, Def. Br. in Supp. 6–8, 15, 18, ECF No. 42-1. "Waverly Gardens" appears to be a specific apartment building located in the "Waverly Woods" development. *See* Taylor Decl. ¶¶ 22–24, ECF No. 42-4. This report and recommendation refers to the property as "Waverly Gardens."

resold "to additional buildings and viewers at [unauthorized] locations" within or near the
Waverly Woods development. *Id.*; *see also id.* ¶ 76. Waverly Gardens' accounts were still open
when DIRECTV filed its Amended Complaint on May 27, 2014. *See id.* ¶¶ 75, 81.

  2.  *The Ideatek Account*

Saylor and Sky Cable also assisted another company in fraudulently obtaining DIRECTV
services. In 2007, Saylor was "retained as a consultant" for a company called Ideatek in Buhler,
Kansas. *Id.* ¶ 42. Saylor "directed" and "advised . . . Ideatek to submit a fraudulent application to
DIRECTV claiming that MDU programming would be supplied" to a qualifying residential
property. *Id.* ¶ 43. To that end, Ideatek submitted an application "with a phony address including
75 sequential apartment or suite numbers so it would appear to DIRECTV that the MDU
programming would be supplied" to several units within one building. *Id.*

DIRECTV approved Ideatek's MDU application and use of a "single head end" to
provide its bulk programming to these units. *Id.* ¶¶ 44, 50. Ideatek instead "provided DIRECTV
programming to over 450 customers primarily in single family homes spread out over more than
20 miles," which caused its cable television infrastructure to unlawfully cross public rights-of-
way. *Id.* ¶ 44.

Ideatek, Saylor, and Sky Cable did not inform DIRECTV that its bulk programming was
being supplied to single-family homes at locations not authorized by DIRECTV. *Id.* ¶ 51.
DIRECTV discovered Saylor's role in this alleged scheme to defraud DIRECTV after a billing
dispute with Ideatek. *Id.* ¶ 52. DIRECTV settled its dispute with Ideatek out of court. *See* Pl. Br.
in Opp. at 4 n.3, ECF No. 43.

### 3.     Continued Use of DIRECTV's Name & Trademarks

DIRECTV terminated its business relationship with Saylor and Sky Cable in spring 2011. *See* Amend. Compl. ¶¶ 6, 84–85. In letters dated March 14, 2011, and March 17, 2011, DIRECTV instructed Saylor and Sky Cable to immediately stop using "any and all DIRECTV trademarks, service marks, [and] trade names," or doing anything that might indicate that Sky Cable was still an authorized DIRECTV dealer or sales agent. *Id.* ¶¶ 84, 85. As of May 27, 2014, Saylor and Sky Cable continued "to hold [themselves] out to the public as authorized sales agents for DIRECTV" by using DIRECTV's name, trademarks, and service marks on Sky Cable's website. *Id.* ¶ 86. They have been doing this without DIRECTV's consent "[s]ince at least April 13, 2011." *Id.*

### 4.     The Counts

DIRECTV names Saylor in his personal capacity as a defendant in all eight counts of the Amended Complaint. Counts One through Six concern Saylor's role in a scheme to enrich himself, his company, and his clients by defrauding DIRECTV and stealing the company's satellite television programming. *See* Amend. Compl. ¶¶ 40–41 (summarizing Saylor's conduct), 88–92 (Count 1, violating 47 U.S.C. § 605(a)), 93–98 (Count 2, violating 18 U.S.C. § 2511(1)(a)), 99–105 (Count 3, fraud), 106–10 (Count 4, unjust enrichment), 111–13 (Count 5, common-law conspiracy), 114–17 (Count 6, statutory business conspiracy). Counts Seven and Eight allege that Saylor used DIRECTV's name and trademarks in violation of 15 U.S.C. §§ 1114 and 1125(a). *See id.* ¶ 1; *see also id.* ¶¶ 84–87, 119–27 (Count 7), 129–32 (Count 8). Defendants Taylor and ECC are named in Counts One through Six only.

II. Discussion

*A.     Saylor's Motion*

On June 16, 2014, Saylor moved to dismiss the Amended Complaint for improper venue, or, in the alternative, to grant arbitration. Saylor Mot. to Dismiss ¶ 1, ECF No. 36. Rule 12 of the Federal Rules of Civil Procedure allows a defendant to move to dismiss a complaint for improper venue before filing a responsive pleading. *See* Fed. R. Civ. P. 12(b)(3). To survive a Rule 12(b)(3) motion "when no evidentiary hearing has been held, the plaintiff need only make a prima facie showing of venue." *Mitrano v. Hawes*, 377 F.3d 402, 405 (4th Cir. 2004). The court may consider evidence outside the pleadings and must take all facts and reasonable inferences in the plaintiff's favor. *Aggarao v. MOL Ship Mgmt. Co., Ltd.*, 675 F.3d 355, 365–66 (4th Cir. 2012).

"Whether venue is 'wrong' or 'improper' depends exclusively on whether the court in which the case was brought satisfies the requirement of federal venue laws . . . ." *Atl. Marine Const. Co. v. U.S. Dist. Court*, --- U.S. ---, 134 S. Ct. 568, 577 (2013). A liberal reading of Saylor's *pro se* motion and brief[4] suggests that he is challenging venue under two very different

---

[4] Most of Saylor's four-page brief simply restates the presiding District Judge's March 23, 2012, memorandum opinion in *Sky Cable v. Coley*, No. 5:11cv48, 2012 WL 1016112 (W.D. Va. March 23, 2012) (Urbanski, J.). *See* Saylor Br. in Supp. 2–4, ECF No. 37 (citing *Coley*, 2012 WL 1016112, at *2–3, *5, *6). Saylor argues that the presiding District Judge "opined [in *Coley*] that venue in this District is improper," and that this opinion applies with equal force in this case. *See id.* at 2. In *Coley*, Sky Cable, LLC, and Saylor sued DIRECTV to collect unpaid commissions on allegedly stolen DIRECTV programming that Sky Cable helped deliver to certain commercial establishments in Virginia. 2012 WL 1016112, at *1. DIRECTV moved to dismiss the amended complaint under Rule 12(b)(6), or, in the alternative, for an order under section 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4, directing Sky Cable and Saylor to arbitrate according to the terms of an underlying agreement with DIRECTV. 2012 WL 1016112, at *2.

The venue question in *Coley* concerned the proper district court for DIRECTV to seek an order compelling arbitration. *See* 2012 WL 1016112, at *5–7. The presiding District Judge concluded that venue was not proper in this District because Saylor, Sky Cable, and DIRECTV had expressly agreed to arbitrate their disputes in Los Angeles. *See id.* at *6–7. Thus, under section

laws: the general venue statute, 28 U.S.C. § 1391, and the venue provision in section 4 of the

Federal Arbitration Act ("FAA"), 9 U.S.C. § 4. *See, e.g.*, Saylor Mot. to Dismiss ¶¶ 1, 6; Saylor

Br. in Supp. 2–4. The former governs venue "in all civil actions brought in [federal] district

courts" except as otherwise provided by law. 28 U.S.C. § 1391(a); *see also Atl. Marine*, 134 S.

Ct. at 577. The latter governs venue in proceedings where a "party aggrieved by the alleged

failure, neglect, or refusal to arbitrate under a written agreement for arbitration" has petitioned a

federal district court "for an order directing that such arbitration proceed in the manner provided

for in such agreement," 9 U.S.C. § 4. *See Am. Int'l Specialty Lines Ins. Co. v. A.T. Massey Coal

Co., Inc.*, 628 F. Supp. 2d 674, 685 (E.D. Va. 2009).

    1.     *Venue under 28 U.S.C. § 1391*

    Venue in this action is governed by the general venue statute. Section 1391 provides in

pertinent part that "a civil action may be brought in . . . a judicial district in which a substantial

part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b)(2). In

determining whether venue is proper under subsection 1391(b)(2), the court should look at "the

entire sequence of events underlying the claim" in addition to the "matters that are in dispute or

that directly led to the filing of the action." *Mitrano*, 377 F.3d at 405.

    DIRECTV's claims against Saylor arose because his company, Sky Cable, was an

authorized DIRECTV dealer between 1998 and 2011. *See* Amend. Compl. ¶¶ 5–6, 40–41.

Beginning in 2006, Saylor "concocted a scheme whereby companies would be able to obtain

special programming packages from DIRECTV at discounted rates by misrepresenting both the

---

4's venue provision, only the United States District Court for the Central District of California could enter an order compelling arbitration according to the terms of that agreement. *See id.* at *7. Notably, the presiding District Judge also found that venue was proper in the Western District of Virginia for most of Sky Cable and Saylor's claims against the other defendants named in that action. *See id.*

type of properties that the programming would be distributed to, and the number of viewers that would be accessing the programming." *Id.* ¶ 41. Saylor also misused confidential business information acquired from DIRECTV to unjustly enrich himself and his Elkton-based company.

The record contains evidence that a Sky Cable employee repeatedly submitted documents to DIRECTV from a 540 telephone number assigned to "Sky Cable USA" in Elkton, Virginia. *See, e.g.*, Jamnback Decl. Ex. 11, at 2–3, ECF No. 44-11; *id.* Ex. 12, at 2–3, ECF No. 44-12; Pl. Hr'g Ex. 1, at 1, ECF No. 49-1. The documents contain physical addresses and subscriber units for the Maryland residential properties, which DIRECTV alleges gave rise to the claims against Saylor in Counts One through Six. *See* Amend. Compl. ¶¶ 40–41, 55–67, 69–82. These allegations are sufficient for a prima facie showing that venue as to those claims is proper in this District. *See Mitrano*, 377 F.3d at 406, 406, n.3 (finding venue proper under § 1391(b)(2) where the plaintiff averred that he performed a substantial part of the work that "allegedly created his entitlement to the payment that he now seeks" while living for one month in the forum district); *CIENA Corp. v. Jarrard*, 203 F.3d 312, 318 (4th Cir. 2000) (finding venue proper under the current § 1391(b)(2) where "[m]any of the events and facts central to th[e] case concerned Jarrard's training, her access to and knowledge of trade secrets, and her job responsibilities, all of which are anchored in" the forum district).

Saylor and Sky Cable have held themselves out to the public as Elkton-based DIRECTV sales agents without DIRECTV's consent "[s]ince at least April 13, 2011." Amend. Compl. ¶ 86. The record contains exhibits showing DIRECTV's name and logo on Sky Cable's live website as of June 30, 2014. *See* Pl. Br. in Opp. 4; Houck Decl. ¶ 3, Ex. A at 7, 9, 10, 14, 33, ECF No. 41. For example, Saylor's name and title ("CEO of Sky Cable, Inc.") appeared just below the DIRECTV logo on a dedicated page titled "IPTV and DIRECTV® MFH3." Houck Decl., Ex. A

at 7. The website also still listed Sky Cable's business address in Elkton, Virginia, at that time. *Id.* at 30. Saylor's continued use of DIRECTV's name and trademarks form the basis for DIRECTV's claims under 15 U.S.C. §§ 1114 and 1125(a). *See* Amend. Compl. ¶¶ 118–27, 128–32. DIRECTV's allegations and evidence that Saylor used those marks in connection with his Elkton-based business is enough for a prima facie showing that these claims fall within subsection 1391(b)(2). *See Mitrano* 377 F.3d at 406, 406 n.3. Therefore, Saylor's Rule 12(b)(3) motion is without merit. *See Atl. Marine*, 134 S. Ct. at 577.

      2.      *Arbitration & Venue under 9 U.S.C. § 4*

      Saylor's motion to dismiss contains an alternative request that the Court "grant arbitration." Saylor Mot. to Dismiss 1, 2. The Court construes Saylor's *pro se* motion as a petition for an order to compel arbitration under section 4 of the FAA, 9 U.S.C. §§ 1–16. *See Green v. Zachry Industrial, Inc.*, --- F. Supp. 2d ---, 2014 WL 1232413, at *2 (W.D. Va. Mar. 25, 2014) ("[A] motion to dismiss in favor of arbitration should be treated as motion to stay litigation and compel arbitration.") (citing *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709–10 (4th Cir. 2001)). Saylor argues that all of DIRECTV's claims against him in this lawsuit "fall[] within the scope" of an unidentified Affiliate Agreement. Saylor Br. in Supp. 2, ECF No. 37. At oral argument, Saylor confirmed that he seeks to compel arbitration according to the terms of the SMATV Affiliate Agreement between Sky Cable, Inc., and DIRECTV ("Agreement")[5] that was at issue in *Sky Cable, LLC v. Coley*, No. 5:11cv48, 2012 WL 1016112

---

[5] At oral argument in this case, counsel for DIRECTV stated that he would not object to the Court taking judicial notice of the Agreement that DIRECTV filed as an exhibit in *Coley*.

(W.D. Va. Mar. 23, 2012) (Urbanski, J.).[6] *See* Saylor Br. in Supp. 2–4 (citing *Coley*, 2012 WL 1016112, at *2–3, *5, *6).

The FAA codifies a strong federal policy favoring arbitration over litigation where the parties have agreed in writing to arbitrate their disputes. *See Am. Express Co. v. Italian Colors Restaurant*, --- U.S. ---, 133 S. Ct. 2304, 2309 (2013) (citing 9 U.S.C. § 2). For example, section 3 requires a federal court, on application of one of the parties, to "stay any 'suit or proceeding' pending the arbitration of 'any issue referable to arbitration under an agreement in writing for such arbitration.'" *United States v. Bankers Ins. Co.*, 245 F.3d 315, 319 (4th Cir. 2001) (quoting 9 U.S.C. § 3). Additionally, "a litigant can compel arbitration under section 4 if he can demonstrate: (1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the [non-moving party] to arbitrate the dispute."*Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500–01 (4th Cir. 2002). If these criteria are satisfied, the district court must enter "an order directing the parties to proceed to arbitration in accordance with the terms of their agreement." 9 U.S.C. § 4; *see Adkins*, 303 F.3d at 500; *Elox Corp. v. Colt Indus., Inc.*, 1991 WL 263127, at *1 (4th Cir. 1991) (unpublished).

---

[6] In *Coley*, DIRECTV moved to dismiss under Rule 12(b)(6), or, in the alternative, for an order under section 4 of the FAA directing Sky Cable and Saylor to arbitrate according to the terms of this Agreement. *See* 2012 WL 1016112, at *2. The presiding District Judge agreed that the "dispute between DIRECTV and Sky Cable, i.e., whether DIRECTV ha[d] any obligation to pay plaintiffs commission on cable programming allegedly stolen by the Coleys, [was] subject to arbitration pursuant to the terms of the parties' contract." *Coley*, 2012 WL 1016112, at *6. DIRECTV then argued that venue was improper in this District under section 4 because the parties had agreed to arbitrate in another judicial district. The Court agreed and dismissed Sky Cable and Saylor's breach of contract and negligence claims against DIRECTV without prejudice so they could arbitrate those claims in Los Angeles. *Id.*

DIRECTV stipulates that the Agreement contains a provision that "[a]ny dispute or disagreement arising between DIRECTV and Affiliate shall be resolved according to binding arbitration conducted in Los Angeles, California . . . ." Jamnback Decl. Ex 1, at ¶ 5.9, *Coley*, No. 5:11cv48, ECF No. 65-2. DIRECTV has neither taken issue with the validity of the Agreement itself nor argued that Saylor waived his right to arbitrate according to the Agreement's terms. *See generally* Pl. Br. in Opp. 6–7, ECF No. 39. The question is whether the arbitration clause covers any "issue" alleged in DIRECTV's claims against Saylor in this case, and, if so, whether this Court has authority under section 4 to compel arbitration according to the Agreement's terms.

   *a.*  *Issues Referable to Arbitration*

Saylor argues that all of DIRECTV's claims against him in this lawsuit "fall[] within the scope" of the Agreement's arbitration clause. Saylor Br. in Supp. 2. DIRECTV responds that "there are no grounds to compel arbitration" because Saylor's status as a DIRECTV dealer "is not a basis for DIRECTV's causes of action" in this lawsuit. Pl. Br. in Opp. 7. DIRECTV also argues that its trademark and false designation claims are "clearly outside the scope of the . . . arbitration agreement" because they "arose based on Saylor's continued use of DIRECTV trademarks *after* Sky Cable's termination as a DIRECTV Authorized Affiliate." *Id.*

This Court must determine whether "any issue . . . involved" in this lawsuit is referable to arbitration under the Agreement, 9 U.S.C. § 3, "regardless of the legal label[s] assigned to" DIRECTV's claims. *J.J. Ryan & Sons v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 321 (4th Cir. 1988) (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985)). Arbitrability is "determined by [analyzing] 'the factual allegations underlying the claim'" as pled in the Amended Complaint. *Branchville Mach. Co., Inc. v. AGCO Corp.*, 252 F. Supp. 2d 307, 311 (E.D. Va. 2003) (quoting *J.J. Ryan & Sons*, 863 F.2d at 321); *see also Summer Rain v. The*

*Donning Co./Publishers, Inc.*, 964 F.2d 1455, 1461 (4th Cir. 1992) (noting that the FAA "requires the separation of arbitrable 'issues' from non-arbitrable ones").

"The twin pillars of consent and intent are the touchstones of arbitrability analysis." *Peabody Holding Co., LLC v. United Mine Workers of Am. Int'l Union*, 665 F.3d 96, 103 (4th Cir. 2012). Because the obligation to arbitrate is a creature of contract, a party cannot be compelled to arbitrate unless he has agreed to do so. *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 290 (2002) (noting that the FAA does not "authorize[] a court to compel arbitration of any issues, or by any parties, that are not already covered in the agreement."). Determining whether the parties agreed to arbitrate a particular issue is primarily a matter of interpreting the underlying contract according to state law. *See Adkins*, 303 F.3d at 501.

Additionally, federal law requires courts to "rigorously enforce" valid arbitration agreements according to their terms. *Italian Colors Restaurant*, 133 S. Ct. at 2309. When, as here, the parties agreed to arbitrate some issues, courts must "insist upon clarity before concluding that the parties did *not* want to arbitrate a related matter." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 945 (1995). This principle is especially applicable to broadly written agreements, such as those expressly covering "'any dispute' between the parties." *Levin v. Alms & Assoc., Inc.*, 634 F.3d 260, 269 (4th Cir. 2011) (noting that the "arbitrability presumption . . . applies with special force" in such cases). Any doubts must be resolved in favor of arbitration, even if state-law principles of contract interpretation might compel the opposite conclusion. *See Adkins*, 303 F.3d at 501.

The Agreement's arbitration clause is very broad: "Any dispute or disagreement arising between DIRECTV and Affiliate shall be resolved according to binding arbitration . . . ." *Cf. Cara's Notations, Inc. v. Hallmark Cards, Inc.*, 140 F.3d 566, 569 (4th Cir. 1998) (characterizing

as "extremely broad" an arbitration clause covering "any controversy or claim arising out of or relating to . . . any aspects of the relationship between" the parties (emphasis omitted)); *AGCO Corp.*, 252 F. Supp. 2d at 311 (same). By its terms, the agreement to arbitrate covers the disputes that arose between DIRECTV and Saylor while the Agreement was in effect.

The Agreement, however, was terminated on June 15, 2011, by letter dated March 17, 2011.[7] Jamnback Decl. ¶ 1, Ex. A, ECF No. 40; *see* Amend. Compl. ¶ 85. A terminated contract necessarily releases the "parties from their respective contractual obligations, except [for those] obligations already fixed under the contract but as yet unsatisfied." *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 205–06 (1991); *accord Welles v. Turner Entm't Co.*, 503 F.3d 728, 738 (9th Cir. 2007) ("[U]nder California law, a termination or cancellation of a contract abrogates only executory rights held under the terminated or cancelled contract."); *Liberty Univ. v. Kemper*, 758 F. Supp. 1148, 1152 (W.D. Va. 1991) ("[A]rbitration clauses remain in effect after the termination of a contract as to matters occurring prior to the termination of the contract."). A post-termination dispute "arises under" a terminated contract "only where it involves facts and occurrences that arose before [termination], where an action taken after [termination] infringes a right that accrued or vested under the agreement, or where, under normal principles of contract

---

[7] The Amended Complaint cites two letters dated March 14, 2011, and March 17, 2011, in which DIRECTV directed Saylor and Sky Cable "to immediately discontinue [their] use of any and all DIRECTV trademarks, service marks, trade names, and any other marks or indicia of association as an authorized DIRECTV dealer." Amend. Compl. ¶¶ 84, 85. The March 14 letter stated that Sky Cable "had been terminated as an Authorized Dealer of DIRECTV products and services effective April 13, 2011," *id.* ¶ 84, while the March 17 letter stated that Sky Cable "had been terminated as an Authorized DIRECTV SMATV Affiliate effective June 15, 2011," *id.* ¶ 85; Jamnback Decl., Ex. A, at 1, Mar. 17, 2011, ECF No. 40. There is no indication that the March 14 letter purports to terminate a written agreement that contains an arbitration clause. The March 17 letter, on the other hand, clearly refers to the SMATV Affiliate Agreement that was at issue in *Coley. Compare* Jamnback Decl., Ex. A, at 1, Mar. 17, 2011, ECF No. 40 (letter terminating SMATV Affiliate Agreement), *with* Jamnback Decl. Ex. 1, *Coley*, No. 5:11cv48, ECF No. 65-2 (SMATV Affiliate Agreement with arbitration clause).

interpretation, the disputed contractual right survives [termination] of the remainder of the agreement." *Litton Fin. Printing Div.*, 501 U.S. at 205–06. DIRECTV's allegations against Saylor do not fit into either the second or third category; thus, under the first category, determining when the alleged acts giving rise to the dispute occurred is critical.

DIRECTV alleges that Saylor's wrongful conduct began "at a time unknown" and, "on information and belief," has "continued to the present." Amend. Compl. ¶ 40. The Amended Complaint cites specific acts taken in 2006 and 2007 by Saylor in furtherance of the alleged scheme.[8] It also provides that as of May 2014 Taylor and ECC were "improperly redistributing DIRECTV satellite television programming"—the result of the alleged scheme devised and implemented by Saylor in 2006. *Id.* ¶ 75. As to the trademark and false designation claims, DIRECTV alleges that Saylor's acts of infringement began as early as April 13, 2011, and have continued through the filing of the Amended Complaint. *Id.* ¶¶ 86, 121, 125. Thus, the Amended Complaint contains allegations that Saylor's conduct as to each Count occurred before the Agreement was terminated on June 15, 2011, and continued after its termination.

In its brief opposing Saylor's motion, DIRECTV argues that its trademark and false designation claims are "clearly outside the scope of the . . . arbitration clause" because they "arose based on Saylor's continued use of DIRECTV trademarks *after* Sky Cable's termination as a DIRECTV Authorized Affiliate." Pl. Br. in Opp. 7. In its Amended Complaint, however,

---

[8] *See, e.g.*, Amend. Compl. ¶¶ 42 (Ideatek hired Saylor in 2007), 55 (Taylor and ECC hired Saylor and Sky Cable in 2006), 56–59 (Saylor and Sky Cable submitted Taylor Village's account documents to DIRECTV in March and April 2006), 63–64 (defendants intended to create fraudulent account for Taylor Village), 65 (DIRECTV relied on false statements when it approved account and activated equipment at Taylor Village), 70–71 (Saylor and Sky Cable submitted Waverly Gardens' account documents to DIRECTV in June 2006), 73–74 (Waverly Gardens account was activated in April 2006), 77–89 (defendants intended to create fraudulent account for Waverly Gardens), 80 (DIRECTV relied on false statements when it approved account and activated equipment at Waverly Gardens).

DIRECTV alleges that Saylor has been using the company's name and trademarks without authorization "[s]ince at least April 13, 2011," or roughly two months before DIRECTV terminated the Agreement containing the arbitration clause at issue here. Amend. Compl. ¶ 86. DIRECTV is bound by this clause to arbitrate its trademark and false designation claims that arose between April 13 and June 15, 2011, even though the allegations in these Counts also cover later conduct. *See Summer Rain*, 964 F.2d at 1461 ("[A]rbitrability is to be determined on an issue-by-issue basis, without regard to the way that the issues are grouped into claims."); *Davidson v. Becker*, 256 F. Supp. 2d 377, 382, 384 (D. Md. 2003) (holding that claim that arose prior to termination of arbitration agreement was subject to arbitration). Accordingly, the Agreement's broad language requires Saylor and DIRECTV to arbitrate all eight Counts of the Amended Complaint arising on or before June 15, 2011.

Even so, DIRECTV cannot be compelled to arbitrate issues that did not arise under the Agreement. *See Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010). At the hearing on the motions, counsel for DIRECTV argued that any portion of the claims that arose after June 15, 2011, should be separated from the claims that arose under the Agreement. Courts that have followed this course appear to have separated only causes of action that can stand on their own from those that are subject to arbitration. Two cases illustrate this point.

*In Re: Hops Antitrust Litigation*, 655 F. Supp. 169 (E.D. Mo. 1987), concerned an antitrust case brought by Anheuser-Busch, Inc., against German hop merchants. Beginning in 1969, the parties entered into numerous contracts for the hop merchants to provide hops to Anheuser-Busch. 655 F. Supp. at 170. In 1982, the parties began including an arbitration clause in the contracts. *Id.* Anheuser-Busch brought suit in federal district court, alleging that from 1976 to 1984 the hop merchants combined to unreasonably restrain trade by fixing prices for the hops.

*Id.* The hop merchants moved to compel arbitration for disputes covering all of the contracts. *Id.* The district court found that the claims concerning the contracts that did not contain an arbitration clause were not subject to arbitration. *Id.* at 172. Despite the allegations of collusion to fix the prices in the contracts, the court reasoned that the contracts were "not interrelated" and "each contract encompasses a discreet transaction between the parties for . . . hops." *Id.* at 172.

In *Davidson v. Becker*, 256 F. Supp. 2d 377, the plaintiff was employed under a contract that included an arbitration clause. *Id.* at 379–81. The defendant terminated the plaintiff, but a month later rehired her. She did not agree to a contract for her second term of employment. *Id.* at 381–82. After the plaintiff was terminated a second time, she filed a single-count complaint alleging discrimination that covered both periods of her employment. The district court determined that some of the plaintiff's claims were subject to the arbitration agreement. *Id.* at 382, 384. The court referred to arbitration the claims that arose up to the plaintiff's first termination and retained the claims that arose in the second term of employment. *Id.* at 384.

In both cases, the claims severed by the courts from the requirement to arbitrate appeared to be stand-alone claims even though commonalities existed between the parties and claims. Conversely, as alleged in the Amended Complaint, no Count or cause of action was complete as of June 15, 2011. Rather the scheme and related conduct alleged in Counts One through Six continued unabated until July 2012 for Taylor Village and May 2014 for Waverly Gardens. *See* Amend. Compl. ¶¶ 66, 81. The trademark and false designation claims against Saylor continued unabated until June 2014. *See* Houck Decl. ¶ 3, Ex. A at 7–10, ECF No. 41. Although the violations continued, the allegations in the Amended Complaint do not establish a discernible separate event occurring after June 15, 2011, that would state a separate cause of action under any of the Counts. I can find no basis to separate the allegations of conduct occurring before and

after termination of the Agreement to allow claims against Saylor arising after June 15, 2011, to proceed in this Court as separate causes of action. Accordingly, I find that all of DIRECTV's claims, in their entirety, against Saylor are subject to arbitration.

Having determined that the issues in each of the Counts against Saylor are referable to arbitration under the Agreement, it is now necessary to determine whether this Court has authority to grant Saylor's petition to compel arbitration according to the terms of the Agreement. *See Coley*, 2012 WL 1016112, at *6–7. This is a question of whether venue for the petition to compel is proper in the Western District of Virginia under section 4 of the FAA.

> b. *Venue*

Saylor argues that the presiding District Judge's decision in *Coley* dictates that venue is improper in the Western District of Virginia as to each of DIRECTV's eight counts against him. DIRECTV argued only that venue is proper in the Western District of Virginia under the general venue statute; it did not address whether venue for the petition to compel was proper under 9 U.S.C. § 4. *See* Pl. Br. in Opp. 4–5. At oral argument, however, counsel for DIRECTV asked that the Court follow *Coley* should it determine that any of its claims against Saylor must be referred to arbitration. I agree that *Coley* provides the proper venue analysis for Saylor's petition to compel.

In *Coley*, DIRECTV argued that venue was improper in the Western District of Virginia because the parties had agreed to arbitrate their disputes in Los Angeles. *See Coley*, 2012 WL 1016112, at *7. As of March 2012, the Fourth Circuit had not addressed whether a district court can compel arbitration when an agreement states that the arbitration itself shall occur in another judicial district. *See id.* at *6, *7. The presiding District Judge followed the approach adopted by a majority of federal courts, *id.* at *7, which "holds 'that a district court lacks authority to compel

20

arbitration in other districts, or in its own district, if another district has been specified for arbitration,'" *id.* at *6 (quoting *Am. Int'l Specialty Lines Ins. Co. v. A.T. Massey Coal Co., Inc.*, 628 F. Supp. 2d 674, 683 (E.D. Va. 2009) (internal brackets and quotation marks omitted)).

*American International Specialty Lines* involved an insurance policy that required any "disagreement" between the parties to be submitted to binding "arbitration proceedings [that] shall take place in or in the vicinity of New York, N.Y." 628 F. Supp. 2d at 677. The plaintiff petitioned the district court for an order directing the defendant to arbitrate according to the agreement's terms. *See id.* at 678. Citing the parties' express agreement to arbitrate in New York, the defendant filed motions to dismiss the petition for lack of subject matter jurisdiction and for improper venue. *See id.* at 681.

United States District Judge Robert E. Payne outlined the three approaches courts had used "in deciding whether a federal district court may compel arbitration when the challenged arbitration agreement states that the arbitration itself shall occur in another district." *Id.* at 682 (collecting cases). The first approach holds that the district court in which the petition is filed "may compel arbitration in the district specified in the arbitration agreement, even though the arbitral district" is beyond the court's geographic reach. *Id.* (citing *Dupuy-Busching Gen. Agency, Inc. v. Ambassador Ins. Co.*, 524 F.2d 1275 (5th Cir. 1975)). The second approach holds that the district court in which the petition is filed can "ignore the forum specified in the arbitration agreement" and compel arbitration in its own district. *Id.* (citing *Textile Unlimited, Inc. v. A..BMH & Co.*, 240 F.3d 781 (9th Cir. 2001)).

The third approach "holds that, where the parties have agreed to arbitrate in a particular forum, only a district court in that forum has authority to compel arbitration under § 4 of the FAA." *Id.* at 683 (collecting cases). "In other words, under [this] majority position, 'a district

court lacks authority to compel arbitration in other districts, or in its own district, if another district has been specified for arbitration.'" *Id.* (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lauer*, 49 F.3d 232, 328 (7th Cir. 1995)). Judge Payne noted that the Fourth Circuit had not yet ruled on the issue, but had "strongly implied that it would align itself with the majority position if it were squarely presented with the issue." *Id.* (emphasis omitted) (citing *Elox Corp.*, 1991 WL 263127, at *1 ("The [FAA] provides that a district court deciding a motion to compel arbitration shall defer to the terms of the parties' agreement. The district court must, therefore, apply a forum selection clause contained in the agreement if such a clause exists. Further, if a court orders arbitration, the arbitration must be held in the same district as the court.")). He also found that this approach was faithful to section 4's express "mandate that arbitration and the order compelling arbitration issue from the same district."[9] *Id.* (internal quotation marks omitted); *accord Elox Corp.*, 1991 WL 263127, at *1. The Fourth Circuit still has not squarely addressed this issue. *See Forshaw Indus., Inc. v. Insurco, Ltd.*, 2 F. Supp. 3d 772, 790 (W.D.N.C. 2014).

I agree with the presiding District Judge's conclusion in *Coley* that the majority approach is correct. Under section 4 of the FAA, venue for a motion to compel arbitration lies in the district specified in the arbitration agreement, which in this case is the Central District of California. Therefore, I respectfully recommend that this Court does not have authority to grant Saylor's petition to compel arbitration.

---

[9] Judge Payne also clarified that section 4 is strictly a venue provision that does not affect the district court's subject matter jurisdiction over the underlying action. *Id.* at 684–85; *cf. Aggarao v. MOL Ship Mgmt. Co., Ltd.*, 675 F.3d 355, 376, 379 (4th Cir. 2012) (affirming the "district court's judgment that the Arbitration Clause was enforceable and that Aggarao must arbitrate his claims against the defendants in the Philippines," vacating the district court's order dismissing the action for improper venue, and instructing the district court to reinstate and *sua sponte* stay proceedings pending arbitration).

The remaining question is how the Court should dispose of Saylor's motions. *Cf. Coley* 2012 WL 1016112, at *7.  In *Coley*, the presiding District Judge weighed the options of transferring or dismissing without prejudice the claims subject to arbitration. *Id.* In this case, transfer under 28 U.S.C. § 1404(a) would not be proper. DIRECTV's claims against Saylor are not "peripheral to the remaining claims" against the other defendants. *See Koh v. Microtek Int'l, Inc.*, 250 F. Supp. 2d 627, 632 (E.D. Va. 2003); *cf. Coley*, 2012 WL 1016112, at *7 (severing the claims against DIRECTV from the action because they were peripheral to Saylor and Sky Cable's claims against the other defendants). On the contrary, Saylor's role in the alleged scheme to defraud DIRECTV is one of the central issues in this lawsuit.

Another option, and the one followed in *Coley*, is to dismiss without prejudice the claims subject to arbitration so that Saylor and DIRECTV may pursue them in the Central District of California. Unlike in *Coley*, the majority of the arbitrable claims against Saylor involve the same nucleus of facts and law as the non-arbitrable claims against the other defendants. Because of the interrelation of these claims, I recommend a third option.

The Court may *sua sponte* stay the litigation while Saylor and DIRECTV proceed to arbitration. *See Aggarao v. MOL Ship Mgmt. Co., Ltd.*, 675 F.3d 355, 376, 380 (4th Cir. 2012) (affirming the district court's judgment that the plaintiff "must arbitrate his claims against the defendants in the Philippines," vacating dismissal of the action for improper venue, and instructing the district court to reinstate and *sua sponte* stay trial of all claims pending arbitration). This approach will allow Saylor and DIRECTV to arbitrate according to the terms of the Agreement and, if necessary, to petition the United States District Court for the Central District of California for an order compelling the other to arbitrate there. *Cf. Alpert v. Alphagraphics Franchising, Inc.*, 731 F. Supp. 685, 689 (D.N.J. 1990). It also will allow this

23

Court to retain jurisdiction over DIRECTV's claims against Saylor.[10] Accordingly, I recommend

that the motion to compel arbitration be denied without prejudice so that Saylor may compel

arbitration in the proper venue if necessary.

At oral argument, counsel for DIRECTV indicated that he would prefer to litigate and

arbitrate simultaneously. Although the FAA sometimes "requires piecemeal litigation if necessary

to effectuate an arbitration agreement," *Sto Corp. v. Lancaster Homes, Inc.*, 11 F. App'x 182, 187

n.3 (4th Cir. 2001), there are cases in which "it may be advisable to stay litigation among the

non-arbitrating parties pending the outcome of arbitration," *Moses H. Mem'l Hosp. v. Mercury

Const. Co.*, 463 U.S. 1, 20 n.23 (1983). This decision "is a matter largely within the district

court's discretion to control its docket." *Am. Recovery Corp. v. Computerized Thermal Imaging,

Inc.*, 96 F.3d 88, 97 (4th Cir. 1996). Concerns over judicial economy, confusion, and possibly

inconsistent results predominate in cases, like this one, where the arbitrable and non-arbitrable

claims share common questions of fact and parties. *See C.B. Fleet Co., Inc. v. Aspen Ins. UK

Ltd.*, 743 F. Supp. 2d 575, 589–90 (W.D. Va. 2010) (collecting cases). In such instances, "the

Court, in its discretion …, will stay the remaining claims until the arbitration has ended." *Id.* at

590.

In *Coley*, the presiding District Judge declined to stay litigation of Saylor and Sky

Cable's claims against the remaining defendants because those claims were unrelated to the

arbitrable claims against DIRECTV. *See* 2012 WL 1016112, at *7. The situation presented by

this case is different. Finding that the majority of the claims referable to arbitration share

---

[10] Although this Court cannot compel the parties to arbitrate in a different judicial district, it can
confirm an arbitration award from another district. *See NII Metals Servs., Inc. v. ICM Steel
Corp.*, 514 F. Supp. 164, 166 (N.D. Ill. 1981); *accord Cortez Byrd Chips, Inc. v. Bill Harbert
Const. Co.*, 529 U.S. 193, 202 (2000) ("[T]he court with the power to stay the action under § 3
has the further power to confirm any ensuing arbitration award" under 9 U.S.C. §§ 9–11);
*Aggarao*, 675 F.3d at 379–80.

common questions of fact and law with the claims against Taylor and ECC, I respectfully recommend that the presiding District Judge *sua sponte* stay the action while Saylor and DIRECTV proceed to arbitration.

B.      *Taylor & ECC's Motion*

Taylor and ECC, both residents of Maryland, moved to dismiss the Amended Complaint for lack of personal jurisdiction. ECF No. 42. Rule 12 of the Federal Rules of Civil Procedure allows a defendant to move to dismiss a complaint for lack of personal jurisdiction before filing a responsive pleading. *See* Fed. R. Civ. P. 12(b)(2). "Where, as here, the district court addresses the question of personal jurisdiction on the basis of motion papers, supporting legal memoranda, and the allegations in the complaint," the plaintiff need make only a prima facie showing that personal jurisdiction exists over the moving defendant. *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 276 (4th Cir. 2009). In making this determination, the "court must take all disputed facts and reasonable inferences" in the plaintiff's favor. *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003); *see also Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989).

A court may exercise personal jurisdiction over a non-resident defendant if authorized by the forum state's long-arm statute and if the exercise of jurisdiction is consistent with due process. *See Carefirst*, 334 F.3d at 396. Courts in Virginia generally may complete this inquiry in one step because the Commonwealth's long-arm statute authorizes the exercise of personal jurisdiction to the extent permitted by the Due Process Clause. *Consulting Eng'rs*, 561 F.3d at 277. DIRECTV alleges that this Court can exercise specific and conspiracy personal jurisdiction over Taylor and ECC based on their long-running business relationship with their Virginia-based

co-defendants, Saylor and Sky Cable.[11] *See* Amend. Compl. ¶ 12; Pl. Br. in Opp. 13 (citing Va. Code § 8.01-328.1(A)(1)).

### 1.     Specific Personal Jurisdiction

The "constitutional touchstone" for exercising personal jurisdiction over a non-resident defendant is that "the defendant purposefully established 'minimum contacts' in the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985). "'[I]t is essential in each case that there be some act by which the defendant purposely avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Id.* at 474–75 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). The "purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or third person." *Id.* at 475 (internal quotation marks and citations omitted). Personal jurisdiction is proper where the "nature and quality" of the defendant's deliberate conduct "creates a 'substantial connection' with the forum," *id.* at 475 n.18, even if the defendant never set foot in the state, *see id.* at 476.

Specific personal jurisdiction lies when "the litigation results from alleged injuries that arise out of or relate to" the defendant's purposeful contact with the forum state and the exercise of jurisdiction "would comport with fair play and substantial justice." *Id.* at 477 (internal quotation marks omitted). The Fourth Circuit "has synthesized the due process requirements for asserting specific personal jurisdiction in a three part test in which [courts] consider (1) the

---

[11] Absent "specific" jurisdiction, a court may exercise "general" personal jurisdiction over a defendant that has purposefully established "continuous and systematic" contact with the forum state, even if those contacts are not also the basis for the current lawsuit. *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002). DIRECTV does not argue that this Court may exercise general personal jurisdiction over Taylor and ECC. *See* Pl. Br. in Opp. 21.

extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the [plaintiff's] claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Consulting Eng'rs*, 561 F.3d at 278 (internal quotation marks omitted); *accord Burger King*, 471 U.S. at 472–73. Courts consider the second and third prongs only if they first determine that the defendant purposefully availed itself of the privilege of conducting activities in the forum state. *Consulting Eng'rs*, 561 F.3d at 278.

> a.  *Purposeful Availment*

The "purposeful availment" prong articulates the constitutional requirement that a non-resident defendant must purposefully establish minimum contacts with the forum state before personal jurisdiction will lie. *Consulting Eng'rs*, 561 F.3d at 278. While the standard is not amenable to mechanical application, the Fourth Circuit has identified several nonexclusive factors to help determine whether it has been met in a particular case. *See id.* (collecting cases). In the business context, these factors include whether the defendant: (1) maintained offices or agents in the forum state; (2) reached into the forum state to solicit or initiate business; (3) deliberately engaged in significant or long-term business activities in the forum state or with a forum-state resident; (4) agreed that the forum state's law would govern business-related disputes; or (5) personally met in the forum state with another person regarding the business relationship. *Id.* Courts also consider "the nature, quality and extent of the parties' communications about the business being transacted," especially if the defendant never visited the forum state. *Id.*

At bottom, the defendant's "relevant conduct must have only such a connection with the forum state that it is fair for the defendant to defend himself [there]." *Tire Eng'g & Distrib., LLC*

*v. Shandong Linglong Rubber Co., Ltd.*, 682 F.3d 292, 301 (4th Cir. 2012) (per curiam) (internal

brackets omitted). For example, the Fourth Circuit has found purposeful availment where a

foreign defendant collaborated with a person in the forum state and their joint enterprise was an

integral part of the dispute. *See, e.g.*, *id.* at 305; *CFA Inst. v. Inst. of Chartered Fin. Analysts of

India*, 551 F.3d 285, 295 (4th Cir. 2009). That has been the case even where the defendant had no

offices or employees in the forum and the defendant's representative never visited the forum "to

forge or further" the business relationship central to the dispute. *Tire Eng'g*, 682 F.3d at 305. In

these cases, the defendants' "repeatedly reaching into [the forum] to transact business" with a

forum resident has "constituted the core" of the Fourth Circuit's jurisdictional holdings. *Id.*

(citing *CFA Inst.*, 551 F.3d at 295).

In contrast, the Fourth Circuit has found purposeful availment lacking where the "locus

of the parties' interaction was overwhelmingly abroad" and the defendants' contact with the

forum state consisted of "some fleeting communication" with persons located there about work

performed elsewhere. *Id.* at 302, 303 (citing *Consulting Eng'rs*, 561 F.3d 273 (India); *Foster v.

Arletty 3 Sarl*, 278 F.3d 409 (4th Cir. 2002) (France)). In these cases, the defendants' relevant

conduct was "simply too attenuated to justify the exercise of personal jurisdiction," especially

given the foreign countries' centrality to the underlying disputes. *Id.* at 302, 303 (citing

*Consulting Eng'rs*, 561 F.3d at 280; *Foster*, 278 F.3d at 415).

Taylor and ECC essentially argue that this Court cannot exercise jurisdiction over them

because "the locus of this case is in Maryland." Def. Mot. to Dismiss ¶ 1, ECF No. 42; Def. Br.

in Supp. 3, ECF No. 42-1. Indeed, they identify the many ways in which they and their

relationship to this case are rooted in Maryland.[12] "This argument misses the mark. The focus of

the 'minimum contacts' analysis is not *which* contacts with the forum are absent, nor *where* the

contacts predominate, but only '*whether* enough minimum contacts with the forum exist such

that the district court's assumption of specific jurisdiction does not offend due process.'"

*Production Grp. Int'l, Inc. v. Goldman*, 337 F. Supp. 2d 788, 798 (E.D. Va. 2004) (internal

brackets omitted) (quoting *English & Smith v. Metzger*, 901 F.2d 36, 39 (4th Cir. 1990)); *accord*

*Consulting Eng'rs*, 561 F.3d at 280, 282 (holding that the defendants' contacts with Virginia were

"too attenuated" to support specific personal jurisdiction in a case where the conduct central to

the dispute took place in India). The fact that "the greater part" of Taylor and ECC's relevant

conduct may have occurred in Maryland does not necessarily mean that Virginia's courts cannot

exercise jurisdiction over them in this case. *See Goldman*, 337 F. Supp. 2d at 798; *Tire Eng'g*,

682 F.3d at 302, 305; *Chesapeake Bank v. Cullen*, No. 3:10cv247, 2010 WL 3785100, at *3 (E.D.

Va. Sept. 10, 2010).

The gravamen of the inquiry is whether Taylor and ECC "purposefully established

sufficient contacts with Virginia to make jurisdiction [here] constitutionally reasonable."

*Goldman*, 377 F. Supp. 2d at 798. The record in this case shows that Taylor and ECC's deliberate

"contacts with Virginia are qualitatively significant," *Tire Eng'g*, 682 F.3d at 305, enough for a

prima facie showing that they "purposefully availed" themselves of the privileges of conducting

business in the Commonwealth.

---

[12] *See, e.g.*, Def. Br. in Supp. 2 (DIRECTV signals received and distributed in Maryland), 2–3
(Taylor and ECC resided in Maryland), 3 (Taylor Village and Waverly Gardens properties
located in Maryland), 4 (all meetings between ECC and DIRECTV or Sky Cable took place in
Maryland), 7 (DIRECTV equipment and systems managed from offices in Maryland), 11–12
(relevant contracts were performed in Maryland and selected Maryland law), 15–18
(summarizing Taylor and ECC's contacts with Maryland).

First, Taylor and ECC chose to retain Saylor and Sky Cable as their authorized DIRECTV dealer knowing that they were located in Virginia. *See* Def. Br. 3; Taylor Decl. at 3, ECF No. 42-2. The Court is "entitled to accord special weight to the fact that [Taylor and ECC] initiated contact with [Saylor and Sky Cable]." *CFA Inst.*, 551 F.3d at 295 n.17. At the very least, Taylor and ECC purposefully established some contact with Virginia—their connection to the Commonwealth is neither fortuitous, random, unknown to them, nor the result of another party's unilateral activity.[13] *Cf. Burger King*, 471 U.S. at 480–81 (finding it significant that the defendant "[e]schew[ed] the option of operating an independent local enterprise" and "reached out" to franchise with a corporation headquartered in the forum state).

Second, Taylor and ECC's decision to engage Saylor and Sky Cable's services in 2005, Def. Br. in Supp. 3; Saylor Decl. ¶ 5, "sparked ongoing business transactions, by which [Taylor and ECC] repeatedly reached into Virginia to transact business with [Saylor and Sky Cable], invoking the benefits and protections of Virginia law," *CFA Inst.*, 551 F.3d at 295. *Compare Consulting Eng'rs*, 561 F.3d at 280, 282, *with Tire Eng'g*, 682 F.3d at 305–06, *and CFA Inst.*, 551 F.3d at 295–96. Taylor and ECC "continued to invoke those benefits and protections when [they] corresponded and collaborated with" Saylor and Sky Cable over the next several years.[14] *CFA*

---

[13] Taylor and ECC aver that they "engaged" Saylor and Sky Cable because DIRECTV "requires commercial customers to deal with one of its nationwide group of agents in order to obtain its programming." Def. Br. 3. They do not allege, however, that DIRECTV unilaterally assigned Sky Cable to the Taylor Village and Waverly Gardens accounts. *See Burger King*, 471 U.S. at 475 n.17 (citing cases in which the non-resident defendant "had no clear notice that it [may be] subject to suit in the forum and thus no opportunity to alleviate the risk of burdensome litigation there" (internal quotation marks omitted)).

[14] *See e.g.*, Taylor & ECC Ex. 3, at 5–7, ECF No. 42-4 (documents listing Sky Cable as the "DIRECTV Affiliate" for Taylor Village, Mar. 2006); Ex. 4, at 1, 3–4, 12, 13, ECF No. 42-5 (documents listing Sky Cable as the "System Operator" for Taylor Village, Mar.–Apr. 2006); *id.* at 5–11 (contract for Saylor and Sky Cable to enter onto Taylor Village's property, Mar. 2006); Ex. 5, at 2–3, 5, ECF No. 42-6 (DIRECTV documents listing Sky Cable as the "System Operator" for Waverly Gardens, June–Aug. 2006); *id.* at 6–12 (contract for Saylor and Sky Cable

*Inst.*, 551 F.3d at 295. Indeed, the record in this case reflects a "substantial and ongoing" relationship, *id.*, in which Taylor/ECC and Saylor/Sky Cable collaborated on projects directly related to this lawsuit.[15] *Compare id.* at 296 (noting that the record did "not invoke images of isolated interaction," but "instead reflect[ed] a purposeful effort by [the India-based defendant] to transact business with [the Virginia-based plaintiff] in the Commonwealth" on projects related to the lawsuit), *with Consulting Eng'rs*, 561 F.3d at 280, 282 (finding that the foreign defendants never began work on the proposed project with the Virginia plaintiff).

Taylor and EEC argue that the vast majority of their dealings with Saylor and Sky Cable took place in Maryland. Even accepting this argument as true, actions taken by a Sky Cable employee in Virginia to manage both the Taylor Village and Waverly Gardens accounts form some of the conduct central to DIRECTV's claims. *Compare Consulting Eng'rs*, 561 F.3d at 280, 282 (finding that the relevant conduct occurred entirely in India), *with Tire Eng'g*, 682 F.3d at

---

to enter onto Waverly Gardens' property and to "solicit and take orders for" television services, June 2006); Jamnback Decl. Ex. 11, at 3, ECF No. 44-11 (documents submitted to DIRECTV from Sky Cable USA regarding Taylor Village's account, Nov. 2006); Taylor & ECC Ex. 5, at 1 (documents regarding Waverly Gardens' DIRECTV account faxed from Sky Cable USA to ECC, Sept. 2008); Jamnback Decl. Ex. 12, at 2–3, ECF No. 44-12 (documents submitted to DIRECTV from Sky Cable USA re: Waverly Gardens' account, Dec. 2008); Jamnback Decl. Ex. 5, at 2, ECF No. 44-5 (consulting agreement regarding DIRECTV services between Saylor and Taylor, Apr. 2011); Saylor Decl. ¶ 5 (declaring that, "[b]etween 2005 and 2012," the named co-defendants "entered into agreements" regarding DIRECTV service for Taylor Village and Waverly Gardens).

[15] *See, e.g.*, *supra* n.14; Saylor Dep. 76:17–19, Sept. 19, 2012, ECF No. 44-1 (testifying that Taylor and ECC are "important clients" with whom he has "done lots of business . . . over the years"); *id.* at 76:9–19, 95:21–22 (testifying that one ECC employee "had a Sky Cable cell phone"); *id.* at 172:1–15 (testifying that Sky Cable "provided [Taylor Village] with DIRECTV residential products," which the property developer "abandoned . . . after [Saylor] was terminated"); Saylor Dep. 67:1–25, Oct. 17, 2012, ECF No. 44-4 (testifying as to Sky Cable's "good business relationship" with Taylor and ECC); Pl. Hr'g Ex. 1, at 1, ECF No. 49-1 (Waverly Gardens' DIRECTV "New Customer Information Form" listing Robert Saylor as the property's contact name and his Elkton, Virginia, address as the property's billing address).

305 (finding that "substantial" relevant conduct occurred in Virginia). In *Tire Engineering*, the Fourth Circuit found "purposeful availment" where the foreign defendant, Linglong, "engaged in extensive collaboration with [its co-defendant] Vance while Vance was working from his office in Virginia" about issues forming the "gravamen" of a dispute over stolen tire designs.[16] 682 F.3d at 305. For example, Linglong's representative "exchanged ideas" with Vance about the tire manufacturing process, particularly "how best to alter [Plaintiff's] designs to make it appear less obvious that they had copied [Plaintiff's] blueprints." *Id.* Vance also "worked on the drawings from his Virginia office, incorporating Linglong's ideas and responding to its concerns and ultimately submitting them to Linglong from Virginia." *Id.* Further, Linglong "knew through its correspondence with Vance" that he was doing these things in Virginia. *Id.*

Here, both parties have filed documents showing that Sky Cable repeatedly submitted account-related documents to DIRECTV from Virginia.[17] These documents report Taylor Village's and Waverly Gardens' physical addresses and subscriber units, which DIRECTV alleges gave rise to its fraud, unjust enrichment, and federal statutory claims against Taylor and ECC. *See* Amend. Compl. ¶¶ 40–41, 55–67 (Taylor Village), 69–82 (Waverly Gardens). Further, Taylor and ECC had information through their correspondence with Sky Cable that a Sky Cable employee had submitted—if not also prepared—these documents from Virginia for Taylor and

---

[16] In *Tire Engineering*, the Court reviewed a challenge to personal jurisdiction that came after full discovery and a trial, which, at that stage, required the plaintiff to prove personal jurisdiction by a preponderance of the evidence. In contrast, discovery has not begun in this case, and DIRECTV needs to establish only a prima facie case for personal jurisdiction in order to survive Taylor and ECC's motion to dismiss.

[17] *See, e.g.*, Taylor & ECC Ex. 3, at 1–12, ECF No. 42-4 (Taylor Village account documents faxed on Sky Cable USA letterhead to DIRECTV's "Contract Department" from a 540 telephone number, Nov. 2006); Jamnback Decl. Ex. 11, at 2–3, ECF No. 44-11 (documents "Re: Taylor Village" faxed on Sky Cable USA letterhead to "DTV Commercial" from a 540 telephone number, Nov. 2006); *id.* Ex. 12, at 2–3, ECF No. 44-12 (same, Dec. 2008); Pl. Hr'g Ex. 1, at 1, ECF No. 49-1 (Waverly Gardens account documents faxed from a telephone number with a 540 area code, June 2006).

ECC's residential property. *See, e.g.*, Taylor & ECC Ex. 5, at 1–12, ECF No. 42-6 (documents regarding "all the paperwork/contracts for Waverly," including account-related documents bearing DIRECTV's logo, faxed from Sky Cable USA to ECC on Sept. 24, 2008). Because of their substance, these communications that form the core of the allegedly fraudulent conduct factor more significantly in the personal jurisdiction analysis than the contract negotiations and discussion of services that the Fourth Circuit found insufficient in *Consulting Engineers*. *See* 561 F.3d at 280 (finding that the defendant's reaching into Virginia—an occurrence the Court doubted—and the communications between the parties were insufficient to confer personal jurisdiction).

It remains to be seen whether Taylor and ECC's communications with Sky Cable in Virginia are "substantially weighty," or whether the Maryland-based defendants might "have reasonably anticipated being haled into court in Virginia" based on those communications alone. *Compare Tire Eng'g*, 682 F.3d at 305–06, *with Foster*, 278 F.3d at 415. Evidence of "substantial" or "extensive" collaboration ultimately may be necessary to prove purposeful availment by a preponderance of the evidence. *See Tire Eng'g*, 682 F.3d at 298. At this point in the litigation, however, DIRECTV need make only a prima facie showing that Taylor and ECC purposefully availed themselves of the privilege of conducting business in the Commonwealth, and the Court must "take all disputed facts and reasonable inferences" in DIRECTV's favor. *See Carefirst*, 334 F.3d at 396.

To summarize, the record reflects that Taylor and ECC hired Saylor and Sky Cable in 2005 for the purpose of securing DIRECTV services knowing that Saylor and Sky Cable were located in Virginia, Taylor and ECC maintained an ongoing business relationship with Saylor and Sky Cable in which Taylor and ECC repeatedly reached into Virginia to transact business on

projects directly related to this lawsuit, Saylor or a Sky Cable employee repeatedly submitted—if not also prepared—documents to DIRECTV from Virginia for the residential properties' accounts, Taylor and ECC had information through their correspondence with a Sky Cable employee that account-related documents were submitted to DIRECTV from Virginia, and several of these documents contain the allegedly false addresses and subscriber numbers that form the core of DIRECTV's claims against Taylor and ECC. I find that this evidence is sufficient to make a prima facie showing of purposeful availment.

b.     *Relation to the Litigation*

The second prong of the specific jurisdiction requirement tests whether the "litigation results from alleged injuries that arise out of or relate to" activities that the defendant "purposefully directed . . . at residents of the forum state." *Burger King*, 471 U.S. at 472–73. The Fourth Circuit has held that this test is "easily satisfied" when the defendant's deliberate contact with the "forum state is the genesis of the dispute." *Tire Eng'g*, 682 F.3d at 303.

DIRECTV argues that its claims against Taylor and ECC "arise out of and are directly related to [their] engaging" Saylor and Sky Cable to establish and manage fraudulent DIRECTV accounts for Taylor Village and Waverly Gardens. Pl. Br. in Opp. 21. Specifically, DIRECTV alleges that Saylor and Sky Cable helped Taylor and ECC "obtain special programming packages from DIRECTV at discounted rates by misrepresenting both the type of properties that the programming would be distributed to[] and the number of viewers that would be accessing the programming." Amend. Compl. ¶ 41. Those alleged misrepresentations are the "genesis," *Tire Eng'g*, 682 F.3d at 303, of DIRECTV's claims against Taylor and ECC. In support of these allegations, DIRECTV has provided specific examples of allegedly fraudulent communications sent from Virginia to DIRECTV. Thus, this requirement is satisfied.

34

c.      *Constitutional Reasonableness*

Finally, the Court must decide whether exercising jurisdiction over Taylor and ECC in

Virginia "would comport with fair play and substantial justice." *Burger King*, 471 U.S. at 476

(internal quotation marks omitted). In "appropriate cases," courts may consider factors such as

the burden imposed on the defendant, the forum state's interest in the action, and the judicial

system's interest in efficiently resolving controversies. *Id.* at 477 (internal brackets omitted).

However, a defendant who has purposefully established sufficient contact with a state to make

jurisdiction there reasonable "must present a compelling case that the presence of some other

considerations would render jurisdiction unreasonable." *Id.* (noting that "[m]ost such

considerations usually may be accommodated through means short of finding jurisdiction

unconstitutional," such as transferring the case to another venue).

Taylor and ECC assert that Virginia has no interest in this case because its resolution

involves no aspect of Virginia law. This argument ignores the obvious interest Virginia has in

overseeing the resolution of allegedly fraudulent business dealings of its citizens and businesses.

This interest extends to interactions between Virginia entities and those of other states.  The

defendants also argue that forcing them to litigate this case in the Western District of Virginia

would be burdensome because they live in Maryland. *See* Def. Br. in Supp. 13 (citing the

"approximately five hour round trip [required] for each court appearance"). The Court is not

persuaded that traveling to Virginia would be "'so gravely difficult and inconvenient' as to place

[Taylor and ECC] at a 'severe disadvantage in comparison to [their] opponent.'" *CFA Inst.*, 551

F.3d at 296 (quoting *Burger King*, 471 U.S. at 476); *see, e.g.*, *Tire Eng'g*, 682 F.3d at 305

(finding that personal jurisdiction in Virginia over a defendant based in the United Arab Emirates

was reasonable in part because it "was able to secure able counsel and should have foreseen the

possibility of being forced to litigate in the forum state"); *CFA Inst.*, 551 F.3d at 296 (finding the

same as to a defendant based in India). Accordingly, DIRECTV has made a prima facie showing

that Virginia's courts may exercise personal jurisdiction over Taylor and ECC in this case.

    2.    *Conspiracy Jurisdiction*

        Courts employ a slightly modified due process analysis when a plaintiff claims that a

non-resident defendant's role in a civil conspiracy supports personal jurisdiction. *See Lolavar v.*

*de Santibanes*, 430 F.3d 221, 229 (4th Cir. 2005). Under conspiracy jurisdiction, one

conspirator's "adequate minimum contacts" with the forum state, *id.*, are attributable to his co-

conspirators "even if they have no other contacts with the forum," *Cline v. Hanby*, No. 2:05-

0885, 2006 WL 3692647, at *7 (S.D. W. Va. Jan. 1, 2006). To survive a motion to dismiss, the

plaintiff must make "a prima facie case of a civil conspiracy among the defendants and show[]

that substantial acts in furtherance of that conspiracy occurred in [the forum state]." *St. Paul Fire*

*& Marine Ins. Co. v. Hoskins*, No. 5:10cv87, 2011 WL 1897683, at *4 (W.D. Va. May 18, 2011)

(Wilson, J.); *accord Unspam Tech., Inc. v. Chernuk*, 716 F.3d 322, 329–30 (4th Cir. 2013)

(requiring more than "bare," "conclusory," or "speculative" allegations).

        DIRECTV has carried its burden at this early stage of the litigation. *See Hoskins*, 2011

WL 1897683, at *4, *4 n.6 (acknowledging "the difficulties of showing a hidden conspiracy

before discovery" and noting that, on a motion to dismiss, the court must make findings in a light

most favorable to the plaintiff). First, DIRECTV's theory "rel[ies] on more than bare

allegations," *Unspam Tech*, 716 F.3d at 329, that Saylor devised a common plan to enrich

himself, his company, and his clients—including Taylor and ECC—by defrauding DIRECTV

and stealing the company's satellite television programming. The pleadings also "contain indicia

of a scheme to defraud," *Hoskins*, 2011 WL 1897683, at *3, by alleging that the defendants

misrepresented the physical address and number of subscriber units at Taylor Village and

Waverly Gardens and purposefully concealed those misrepresentations from DIRECTV while

the accounts were active. *See* Amend. Compl. ¶¶ 56, 58, 59, 65, 66, 72–73, 81.

Second, DIRECTV's theory relies on more than Saylor and Sky Cable's mere presence in

Virginia. Indeed, both parties have submitted evidence that substantial acts in furtherance of this

alleged conspiracy occurred in Virginia, namely the submission of statements by the defendants

regarding the number and location of units receiving DIRECTV services. *See, e.g.*, Taylor &

ECC Ex. 3, at 1–12, ECF No. 42-4 (Taylor Village account documents reporting subscriber units

faxed to DIRECTV's "Contract Department" from a telephone number with a 540 area code);

Jamnback Decl. Ex. 11, at 2–3, ECF No. 44-11 (documents "Re: Taylor Village" reporting

subscriber units faxed to "DTV Commercial" from a telephone number with a 540 area code); *id.*

Ex. 12, at 2–3, ECF No. 44-12 (same, Dec. 2008); Pl. Hr'g Ex. 1, at 1, ECF No. 49-1 (Waverly

Gardens account documents reporting subscriber units faxed to DIRECTV from a telephone

number with a 540 area code).

Finally, DIRECTV has provided evidence that Taylor and ECC were part of the alleged

civil conspiracy. DIRECTV has alleged a scheme whereby Saylor and Sky Cable assisted their

customers in underreporting the number of dwelling units receiving DIRECTV programming.

Saylor and Sky Cable worked out of their headquarters in Elkton, Virginia. Sky Cable faxed from

Virginia to ECC in Maryland documents used to establish service with DIRECTV. *See, e.g.*,

Taylor & ECC Ex. 5, at 1–12, ECF No. 42-6 (documents regarding "all the paperwork/contracts

for Waverly," including account-related documents bearing DIRECTV's logo, faxed from Sky

Cable USA to ECC on Sept. 24, 2008). These documents allegedly underreported the number of

units and locations receiving DIRECTV services and form the core of DIRECTV's civil

conspiracy claims against the Defendants. The alleged underreporting would have significantly eroded Saylor's and Sky Cable's commissions from DIRECTV. *Cf. Coley*, 2012 WL 1016112, at *1 ("According to [Saylor and Sky Cable], because Randy Coley grossly underreported to DIRECTV the number of units receiving a signal, Sky Cable has been damaged because it did not receive the commissions to which it was entitled."). Thus, the reasonable inference is that Saylor and Sky Cable received some benefit from another source, namely Taylor and ECC. Otherwise, they would have no incentive to reduce their own commissions.

These allegations and supporting evidence are sufficient to establish the Court's authority to exercise conspiracy jurisdiction over Taylor and ECC at this early stage of the litigation. *See Hoskins*, 2011 WL 1897683, at *4 n.6 (noting that the plaintiff may not be able to prove its conspiracy claims at trial, yet still denying the defendant's motion to dismiss).

DIRECTV has made a prima facie showing that the Court may exercise personal jurisdiction over Taylor and ECC. If after discovery Taylor and ECC believe that DIRECTV cannot prove personal jurisdiction by a preponderance of the evidence, then they may move for summary judgment on that issue. *See Carefirst*, 334 F.3d at 396 (plaintiff ultimately must prove personal jurisdiction by a preponderance of the evidence); *A Love of Food I, LLC v. Maoz Vegetarian USA, Inc.*, 870 F. Supp. 2d 415, 421 (D. Md. 2012).

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **DENY with prejudice** Saylor's motion to dismiss for improper venue and **DENY without prejudice** his motion to compel arbitration, ECF No. 36. I also respectfully recommend that the presiding District Judge **DENY without prejudice** Taylor and ECC's motion to dismiss for lack of personal jurisdiction, ECF No. 42.

I further recommend that the action be stayed while DIRECTV and Saylor proceed to arbitration in Los Angeles. Within 90 days of the presiding District Judge's order entering the stay, DIRECTV should submit a report regarding the status of arbitration with Saylor. If arbitration or proceedings to compel arbitration have not commenced by that time, the Court will *sua sponte* lift the stay to allow for briefing on how to proceed.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Michael F. Urbanski, United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record and unrepresented parties.

ENTER:  November 25, 2014

Joel C. Hoppe
United States Magistrate Judge

39